# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 91 C 4482 | **DATE** | 4/8/2002 |
| **CASE TITLE** | United States vs. Nalco Chemical Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant/Third Party Plaintiff ComEd's motion for partial summary judgment is granted. Third-Party Defendants Amerock, Gm, Keystone, Quality Metal and Valspars' cross-motion for summary judgment against ComEd is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | APR 10 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | COY | 694 |
| | Mail AO 450 form. | | docketing deputy/initials | |
| | Copy to judge/magistrate judge. | | | |
| | | courtroom deputy's initials | date mailed notice | |
| | EF | | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

APR 1 0 2002

UNITED STATES OF AMERICA,  )
  )
Plaintiff,  )
  )
v.  )  Case No. 91 C 4482
  )  HONORABLE CHARLES R. NORGLE
NALCO CHEMICAL COMPANY,  )
GENERAL MOTORS CORPORATION,  )
NATIONAL LOCK COMPANY,  )
INTERSTATE POLLUTION CONTROL,  )
INC., AND COMMONWEALTH  )
EDISON CORPORATION,  )
  )
Defendants.  )
  )
COMMONWEALTH EDISON  )
CORPORATION  )
  )
Thrid-Party Plaintiff  )
  )
v.  )
  )
BASF CORPORATION, QUALITY  )
METAL FINISHING COMPANY,  )
CINCINNATI MILLACRON  )
MARKETING SYSTEM, ECOLAB  )
INC., E.I. DUPONT-DENEMOURS  )
AND COMPANY, FREDERICK GUMM  )
CHEMICAL COMPANY, INC.,  )
THE GLIDDEN COMPANY, TURCO  )
PUREX INDUSTRIAL CORPORATION,  )
THE VALSPAR CORPORATION,  )
HENKEL CORPORATION, ATOCHEM  )
NORTH AMERICA, INC., AMEROCK  )
CORPORATION, BARBER-COLEMAN  )
COMPANY, ELCO INDUSTRIES, INC.  )
ROCKFORD PRODUCTS  )
CORPORATION, COLTEC  )
INDUSTRIES, FRANTZ  )
MANUFACTURING COMPANY,  )
GENERAL ELECTRIC COMPANY,  )

694

LAWRENCE BROTHERS, INC., )
PARK PLATING AND METAL )
FINISHING COMPANY, RACO, INC., )
UNITED STEEL & WIRE COMPANY, )
NATIONAL LOCK COMPANY, )
ATWOOD INDUSTRIES, INC. )
QUEBECOR PRINTING MOUNT )
MORRIS, INC., RB&W CORPORATION, )
SUNSTRAND CORPORATION, )
WOODWARD GOVERNOR COMPANY, )
INC. )
)
           Third-Party Defendants. )

## OPINION AND ORDER

CHARLES R. NORGLE, Sr., District Judge:

Before the court is Defendant/Third-Party Plaintiff Commonwealth Edison's ("ComEd")

motion for partial summary judgment against Third-Party Defendants Amerock Corporation

("Amerock"), General Motors Corporation ("GM"), Keystone Consolidated Industries, Inc. a/k/a

National Lock ("Keystone"), Qaulity Metal Finishing Company ("Qaulity Metal"), Rockford

Products Corporation ("Rockford Products"), and the Valspar Corporation ("Valspar").[1] Also before

the court are two other motions for summary judgment: Third-Party Defendants' Amerock, GM,

Keystone, Qaulity Metal, and Valspar cross-motion for summary judgment against Defendant/Third-

Party Plaintiff ComEd; and Third-Party Defendant Rockford Products cross-motion for summary

judgment against Defendant/Third-Party Plaintiff ComEd. For the following the reasons,

---

[1] For clarity the court will refer to Amerock, GM, Keystone, Quality Metal, Rockford
Products, and Valspar as Third-Party Defendants unless specifically referring to an individual
Third-Party Defendant.

Defendant/Third-Party Plaintiff ComEd's motion for partial summary judgment is granted and Third-Party Defendants' cross-motions for summary judgment are denied.

## I. BACKGROUND[2]

This case involves the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601 et seq. ("CERCLA"). The vortex of this litigation is two pieces of adjacent property in Byron, Illinois. One piece of property is the Dirks Farm Property ("DFP") located west of Razorville Road in Byron, Illinois. The other piece of property is the Byron Salvage Yard ("BSY") located east of Razorville Road in Byron, Illinois. At some point, with some evidence indicating as early as the 1940's, the two sites began to be used for waste disposal. By 1970, the Illinois Environmental Protection Agency ("IEPA") had become aware of hazardous substances as well as waste disposal activities on BSY and DFP. As a result, the IEPA brought an action against the owners of BSY.

On March 8, 1973, ComEd, purchased DFP in connection with the proposed construction of a generating facility. Although it is disputed when ComEd actually discovered DFP was contaminated, it was clear by May of 1974 when three dead cattle were found on the property. With the discovery of the dead cattle, and eventual confirmation of cyanide poisoning as the cause of death of at least two of the cattle, ComEd initiated cleanup of DFP. As part of the cleanup, ComEd took several steps including soil and groundwater investigation. The initial soil and groundwater investigation revealed the following contaminants on DFP: cyanide; arsenic; cadmium; chromium;

---

[2] The following facts are taken from both parties' statement of facts submitted in accordance with Local Rule 56.1, and any disputes are noted in the text.

lead; mercury; nickel; zinc; phenols and halogenated organics, including TCE, vinyl chloride, PCE and 1,2 dichloroethylene; in addition to benzene; toluene; ethylbenzene and xylenes.

ComEd in conjunction with the IEPA quickly developed a cleanup plan to capture and treat contaminated surface water run-off, remove barrels and any contaminated soil, and sample the groundwater. The plan was put into effect in May of 1974. Between October and December of 1974, ComEd removed approximately 1,500 barrels of waste, which consisted primarily of cyanide with lesser amounts of acids and oils. After this phase of the cleanup, ComEd began the removal and treatment of contaminated soil, which lasted until the summer of 1976. After 1976, ComEd continued to monitor the groundwater in the area to determine if there was any further dispersion of contaminants.

On July 17, 1981 the IEPA recognized ComEd's cleanup of DFP. However, in 1987, the United States Environmental Protection Agency ("USEPA") placed both BSY and DFP on the National Priorities List, in what it called the Byron Superfund Site.

In July of 1991, the USEPA sued Nalco Chemical Company, General Motors Corporation, National Lock Company, Interstate Pollution Control, Inc., and ComEd to recover the cost of the cleanup of the Byon Superfund Site. On March 23, 1992, ComEd filed a third-party complaint against Amerock, GM, Keystone, Qaulity Metal, Rockford Products, and Valspar. Shortly thereafter, GM and Keystone filed third-party complaints as well. All told, the different third-party complaints added 28 additional defendants and alleged that each defendant was liable under CERCLA as generators of hazardous substances disposed of at the Byron Superfund Site.

ComEd and certain Third-Party Defendants now move for summary judgment against each other.

4

## II. DISCUSSION

### A. Standards for Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Shank v. William R. Hague, Inc., 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. See e.g. Navarro v. Fuji Heavy Industries. Ltd., 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. See id. It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. See Rand v. CF Industries, Inc., 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. See Fed. R. Civ. P. 56(c); Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice

of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); First Nat'l. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Amercian Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994) (citing Anderson, 477 U.S. at 249-50; 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure: Civil § 2712, at 574-78 (2d ed. 1983)).

## B. CERCLA, Statue of Limitations, and Innocent Purchaser

ComEd argues that Third-Party Defendants are liable under CERCLA. Third-Party Defendants counter that ComEd's action is time barred, and that ComEd cannot recover because it is not an innocent purchaser. As discussed below, ComEd is entitled to judgment as to liablity and Third-Party Defendants' arguments are without merit.

### 1. CERCLA:

Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), codified at 42 U.S.C. § 9601 et seq., on December 11, 1980. The intent of Congress in enacting CERCLA was twofold:

> First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created . . . .

Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 420 (7th Cir. 1994) (quoting John Boyd Co. v. Boston Gas Co., 775 F.Supp. 435 (D. Mass. 1991)). CERCLA represents "the need both to clean up the nation's toxic waste sites and the practical imperative to find the necessary money for the job. The cleanup will be less likely to occur if potentially responsible parties do not come forward, yet the often astronomical sums needed to restore these sites can deter prompt remedial action." Rumpke of Indiana, Inc. v. Cummins Engine Company, Inc., 107 F.3d 1235, 1236 (7th Cir. 1997). CERCLA was reauthorized and expanded into its present day form in the 1986 Superfund Amendments and Reauthorization Act (SARA).

> SARA expanded the types of costs which could be recovered from responsible parties. These now include virtually every conceivable expense, including health assessments and health effects studies, and interest from the date payment is demanded. It provided specifically for actions for contributions. It dealt with the unanswered question as to how clean is clean. It provided for explicit cleanup standards, stating that remedial actions which permanently reduce toxics are to be preferred over remedial actions which do not involve permanent reduction.

Chicago, Miwaukee, St. Paul & Pacific Railroad Co. v. Union Pacific Railroad, 78 F.3d 285, 289 (7th Cir.1996) (internal citations omitted).

CERCLA allows private parties to recover the costs they incur in cleaning up hazardous wastes. Nutrasweet Company v. X-L Engineering Co., 227 F.3d 776, 780 (7th Cir. 2000). There are two paths of financial recovery a private party may take under CERCLA, Section 107(a) and Section 113(f).[3] Section 107(a) states in relevant part:

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a trasporter for transport for

---

[3] Section 107(a) is codified at 42 U.S.C. § 9607(a) and Section 113(f) is codified at 42 U.S.C. 9613(f). For efficiency the court will refer these codified sections as 107(a) and 113(f).

disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, . . . [shall be liable for]

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; . . . .

42 U.S.C. § 9607(a); see also Town of Munster, Indiana v. Sherwin-Williams Co., Inc., 27 F.3d 1268, 1270 (7th Cir. 1994). Under § 113(f), any party found liable for clean-up costs may seek contribution from other liable or potentially liable parties and "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate . . . ." Town of Munster, 27 F.3d at 1270 (citing 42 U.S.C. § 9613(f)(1)).

An owner of land is strictly liable for hazardous wastes that are contaminating his property. Nutrasweet, 227 F.3d at 783 (citing Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 325 (7th Cir.1994)). Under § 113(f), the landowner "may seek contribution from another person who is liable or potentially liable under § 107." Nutrasweet, 227 F.3d at 784 (citing Kerr-McGee, 14 F.3d at 326.) Thus, under "the CERCLA statutory scheme, § 113(f) creates a mechanism for apportioning that liability among responsible parties." Nutrasweet, 227 F.3d at 784 (citing Town of Munster, 27 F.3d at 1270); see also Dura Automotive Systems of Indiana, Inc., v. CTS Corp., No. 01-1081, 2002 WL 501027, at *1 (7th Cir. Apr. 4, 2002).

However, an exception to the strict liability rule exists. A landowner may bring a § 107 action to recover for its direct injuries "if a party seeking relief is itself not responsible for having caused any of the hazardous materials to be spilled onto the property. Rumpke, 107 F.3d at 1238 (citing Akzo Coating, inc. v. Aigneer Corp., 30 F.3d 761, 764 (7th Cir. 1994)). Thus, a landowner

who, although technically strictly liable for hazardous wastes on its property but was innocent of the contamination, would not have to bring a contribution action under § 113(f) (because he did not "contribute" to the contamination); he could instead bring "a direct cost recovery action" under § 107(a) against the responsible party. Nurtrasweet, 227 F.3d at 784 (citing Akzo, 30 F.3d at 764). Such an action is available if "a landowner [is] forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands." Nurtrasweet, 227 F.3d at 784-85 (citing Akzo, 30 F.3d at 764); see also Rumpke, 107 F.3d at 1240.

To establish what has been called the Akzo exception under § 107(a), a plaintiff must establish that: (1) the defendant is a covered person under § 107(a); (2) there is a release or threatened release of a hazardous substance from a "facility" as defined by § 101(9); (3) the release caused the plaintiff to incur response costs that are consistent with the National Contingency Plan; and (4) the plaintiff "did not pollute the site in any way." Nutrasweet, 227 F.3d at784 (citing Rumpke, 107 F.3d at 1241).

ComEd argues that it is entitled to direct recovery under § 107(a) because it can prove each of the abovementioned Akzo factors against Third-Party Defendants. Third-Party Defendants argue that ComEd is not an innocent purchaser, ComEd likely polluted the DFP, and there exists genuine issues of material fact whether any one of Third-Party Defendants arranged for disposal of hazardous substances at DFP. The court finds the arguments of ComEd persuasive and will address each factor under Akzo in turn.

### a. Release or Threatened Release of a Hazardous Substance

ComEd demonstrates that there was a release or threatened release of hazardous materials at the Byron Superfund Site, including DFP. CERCLA defines the term release as "any spilling,

leaking pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), . . . ." 42 U.S.C. § 9601(22). Further, hazardous substance is defined as

> (A) any substance designated pursuant to section 1321(b)(2)(a) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (c) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15.

42 U.S.C. § 9601(14). Lastly, CERCLA defines a facility as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). With these definitions in mind, the court turns to the parties' arguments.

As evidence of a release or threatened release, ComEd cites to the affidavit of John Griggs ("Griggs"), Ph.D., an environmental engineer who found that the Byron Superfund Site was contaminated with the following hazardous substances: cyanide; arsenic; cadmium; lead; mercury; nickel; zinc; phenols and halogenated organics, including TCE vinyl chloride, PCE and 1,2 dichloroethan; in addition to benzene, toluene, ethybenzen; and xylenes. (See ComEd's Local Rule 56.1 Statement of Facts, Ex. 3-A.) ComEd logically surmises from this evidence that there is no

question that there was a release or threatened release of hazardous substances. (See ComEd's Mot. for Summ. J., p. 7.) In response, Third-Party Defendants contend that BSY and DFP are separate and distinct facilities. Third-Party Defendants state that CERCLA requires a plaintiff to link a defendant to the particular facility at issue in order to hold it liable. See 42 U.S.C. § 9607(a)(3). Thus, Thrid-Party Defendants argue, it is misleading to treat the collective Byron Superfund Site and DFP as one and the same, especially since ComEd has previously argued they are separate and this court has ruled they are separate. (See Consolidated Response to Mot. for Partial Summ. J., pp. 10-11.) Third-Party Defendants arguments are without merit.

What needs to be made clear is that there are two separate facilities, BSY and DFP, contained within the Byron Superfund Site as designated by the USEPA. Third-Party Defendants correctly point out that this court adopted the Report and Recommendation of Magistrate Judge Bobrick which dismissed claims against ComEd for contribution costs solely at BSY because BSY was separate and distinct from DFP. (See Minute Order of May 2, 1995). However, as ComEd points out, these facts do not have any bearing on whether the Third-Party Defendants' released or threatened a release which contaminated DFP. The fact remains, and Third-Party Defendants have not disputed it, that hazardous substances are present on both BSY and DFP. Further, GM has admitted, that the evidence shows that "[BSY] and [DFP] were used interchangeably [by Ernie Johnson, Roto Rooter/Interstate Pollution Control, and local manufacturers] as waste disposal sites." (Reply to Mot. for Partial Summ. J., Ex. 1, pp. 3-5.). Finally, and most significantly, evidence shows that waste disposed of only at BSY caused contamination at DFP. The 1994 USEPA Remedial Investigation/Feasiblity Study ("RI/FS") and 1999 Record of Decision ("ROD") both concluded that waste from BSY commingled with waste from DFP in the groundwater plumes. (Reply to

11

Respondents' Statement of Additional Facts, Ex. 1.) Thus, even if the waste disposal was limited only to BSY, the Disposal clearly caused contamination of DFP. On these facts, ComEd demonstrates that a release, as defined by CERCLA, occurred.

### b. Generators of Hazardous Substance

Next, ComEd must demonstrate that Third-Party Defendants are a covered person under § 107(a). See 42 U.S.C. § 9607(a). One possible means to accomplish this is to establish that each Third-Party Defendant is a generator of hazardous substances. See 42 U.S.C. 9607(a)(3). In order to demonstrate that the Third-Party Defendants' are generators of hazardous substances, ComEd must show that: (1) a Third-Party Defendant's waste was shipped to a facility; and (2) hazardous substances similar to those contained in Third-Party Defendant's waste remained present at the time of the release. Town of Munster v. Sherwin-Williams Co., Inc., 27 F.3d 1268, 1273 n.3 (7th Cir. 1994).

ComEd contends that evidence establishes that each Third-Party Defendant has disposed of waste at the Byron Superfund Site, as well as at DFP. ComEd alleges that: (1) Ernie Johnson, working for Roto-Rooter, picked up paint waste and other hazardous substances from the GM facility in Janesville, Wisconsin and disposed of it at the Byron Superfund Site; (2) Ernie Johnson, working for Roto-Rooter, picked up plating wastes, including cyanide and TCE from Keystone's facility in Rockford, Illinois and brought it to the Byron Superfund Site; (3) waste from Valspar, including solvents and liquids, was disposed of at the Byron Superfund Site; (4) waste from Quality Metal, including a zinc buffing compound and cyanide, was disposed of at the Byron Superfund Site; and (5) waste from Amerock and Rockford Products, including cyanide waste, was disposed of at the Byron Superfund Site. Further, ComEd alleges that each of these hazardous substance remained

present at the Byron Superfund Site. Third-Party Defendants contend that none of the evidence cited by ComEd establishes a direct and uncontroverted link to DFP. Third-Party Defendants argue that ComEd continually refers to waste disposal or dumping at the Byron Superfund Site and BSY, rather than any disposal or dumping at DFP. Based on this, Third-Party Defendants argue that ComEd cannot claim that any of the Third-Party Defendants caused any of the contamination at DFP. Once again the court finds the argument of ComEd persuasive.

Third-Party Defendants fail to offer evidence that would rebut the evidence provided by ComEd as to the disposal of waste at BSY, and more importantly at DFP. Initially, it must be noted again that GM admitted that disposal of waste was occurring at both DFP and BSY. (See Reply to Mot. for Parial Summ. J., Ex. 1, pp. 3-5.) The court will address each Third-Party Defendant and the evidence of their dumping in turn.

Regarding GM, there is no dispute that Ernie Johnson, working for Roto-Rooter, transported waste from GM's Janesville plant. Nor does GM dispute that Johnson disposed of this waste at BSY. GM further admits that Johnson disposed of a few barrels on DFP. (See Consolidated Response to Mot. for Partial Summ. J., p. 12.) Even more important is the fact that GM drums were found on DFP. (See id.) Yet the most significant fact remains, literally, in the soil and groundwater itself. Evidence has shown that the type of waste that GM generated was found at DFP. (See ComEd's Local Rule 56.1 Statement of Facts, Ex. 17-A.) Under CERCLA, the plaintiff need only show that waste of the same type deposited or transported by the defendant was found at the site where there has been a release or threatened release. See Town of Munster, 27 F.3d at 1273.

The same also holds true for Keystone. Keystone is unable to offer any evidence to contradict that the type of waste that it generated was found at DFP.

Valspar not only has the same problem faced by GM and Keystone, overcoming the presence of the same hazardous substances on DFP, but that there is direct testimony that Valspar's waste was disposed at DFP. The uncontradicted testimony of Ernie Johnson, Jr. and Ron Johnson confirms that Robert Bell, who Valspar admits disposed of the waste it generated, dumped on DFP. (See ComEd's Local Rule 56.1 Statement of Facts, Ex. 2-P; Ex. 1-G, p. 18.)

Quality Metal also faces the problem that hazardous substances, the same type as those they disposed of, were found on DFP. Additonally, there is clear evidence that Earl Norup, who was hired by Quality Metal to dispose of waste, dumped at DFP. (See ComEd's Local Rule 56.1 Statement of Facts, Ex. 1-E, pp. 10-11.) Quality Metal offers the unpersausive argument that Norup disposed of waste that was of unknown origin at DFP. However, when the admission that Norup disposed of waste at DFP is combined with the evidence that hazardous substances of the same type that Quality Metal's generated were found at DFP, it is clear that Norup disposed of Quality Metal's waste at DFP. Further, and which makes Quality Metal's arguments all the more implausible, are that drums with the Steven Manufacturing label, the predecessor of Quality Metal, were found on DFP.[4] (See ComEd's Local Rule 56.1 Statement of Facts, Ex. 2-Q, pp. 53-54; Ex. 2-R, pp. 14-15.)

Lastly, Amerock and Rockford Products do not offer any evidence to rebut ComEd's evidence that Roto-Rooter, who had been hired by Amerock and Rockford Products to dispose of cyanide waste, disposed of waste at DFP. When the evidence that Roto-Rooter's trucks were seen dumping waste on DFP is combined with the evidence that cyanide waste, the same types of waste

---

[4] Quality Metal offers the affidavit of Mario Bortoli, who began employment at Quality Metal in 1950, to rebut that the drums with Steven's Manufacturing labels were found at DFP. ComEd is correct to point out that the drums with the Steven's Manufacturing labels were from 1942 or 1944. This predates Mr. Bortloi association with Quality Metal. Thus, Quality Metal will not be heard to argue that Mr. Bortloi's affidavits rebuts this evidence.

generated by Amerock and Rockford Products, was found at DFP, there is no doubt that Amerock and Rockford Products are directly linked to DFP. (See ComEd's Local Rule 56.1 Statement of Facts, Ex. 2-R, pp. 21, 24-26; Ex. 1-G, pp. 31-33; Ex. 1-H, pp. 20-23.)

### c. Response Costs Consistent with the National Contingency Plan

The third requirement of <u>Akzo</u> is that Third-Party Defendants' release caused ComEd to incur response costs that are consistent with the National Contingency Plan ("NCP"). As ComEd correctly cites "[t]he purpose of the National Oil and Hazardous Substances Pollution Contingency Plan is to provide the organizational structure and procedures for and responding to discharges of oil and releases of hazardous substances." 40 CFR 300.1 (1990); <u>see also</u> 42 U.S.C. § 9605; <u>Schalk v. Reilly</u>, 900 F.2d 1091, 1093 (7th Cir. 1990). A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements and results in a CERCLA quality cleanup. 40 C.F.R. 300.700(c)(3)(i)(1990). The Seventh Circuit has held that action approved by the IEPA satisfies the NCP. See <u>NutraSweet</u>, 227 F.3d at 791. All of ComEd's action were approved and in cooperation with the IEPA and USEPA. Further, Third-Party Defendants do not even challenge ComEd's compliance with the NCP. All of ComEd's action have been consistent with the NCP and its subsequent revisions, satisfying this requirement.

### d. Pollution of the Site

The last requirement of the <u>Akzo</u> exception is whether ComEd polluted the land in any way. ComEd's position, obviously, is that their actions were to rid DFP of pollution. In contrast, Third-Party Defendants argue that ComEd's actions to cleanup DFP actually exacerbated environmental contamination by not "immediately initiating its removal action, and once initiated, by acting

carelessly." (Consolidated Response to Mot. for Partial Summ. J., p. 9.) Third-Party argues that ComEd's failure to promptly remove the drums left on DFP likely caused substantial release of hazardous substances between 1973 and 1976. (See id.) "ComEd also likely exacerbated the existing contamination while performing the emergency removal work on the DFP by two additional actions: (1) ComEd created ponds to hold and treat waste water generated by the work, but allowed the waste waters to soak into the soil; and (2) ComEd attempted, only partially successfully, to treat the cyanide contaminated soils by "ripping" the soils, an action that can spread contaminants, and then by applying a liquid chemical treatment, an action that can spread organic contaminants to groundwater." (Id. at 9-10.) The court finds the argument of Third-Party Defendants totally unpersuasive.

Initially it must be recognized that Third-Party Defendants do not offer any citation to authority that would support the theory that faulty cleanup efforts by ComEd would absolve Third-Party Defendants of liability. Regardless, Third-Party Defendants claim that because of ComEd's delay in removing drums immediately there likely was substantial release of hazardous substances making ComEd a polluter. However, Third-Party Defendants have not provided any evidence to substantiate that the delay caused further contamination of the property beyond the original disposal of the hazardous substances. Further, it has been recognized that a cost recovery action under the Akzo exception is allowable even after delay in beginning cleanup. Nutrasweet, 227 F.3d at 779-80; Rumpke, 107 F.3d at 1236. CERCLA is more concerned with who placed the hazardous substances on the property, rather than when it was cleaned up. The responsibility lies with the those who disposed of the hazardous substances.

16

Next, Third-Party Defendants contend that ComEd polluted DFP during its cleanup. Specifically, Third-Party Defendants argue that ComEd polluted DFP by creating ponds to hold and treat waste water and spreading contaminates in its efforts to treat the soil. (See Consolidate Response to Mot. for Partial Summ. J., p. 10.) These contentions are unsupported by any test or analysis evidence. Rather, the foundation of the argument rests on the speculative affidavit of Mr. Alan Van Norman, an environmental engineer. (See Consolidated Local Rule 56.1 Statement of Facts, Ex. 34.) Mr. Van Norman fails to specifically cite to any evidence that would establish that further contamination occurred because of the actions of ComEd. (Id.) Rather, Mr. Van Norman's affidavit states it is "likely" that the actions of ComEd caused further contamination. (Id.) Most revealing of the co-defendant's contention and Mr. Van Norman's affidavit is the reference to "ponds" used as holding areas for contaminated ground water. The evidence, however, does not establish the use of any pond or ponds to hold contaminated ground water. (See Consolidated Local Rule 56.1 Statement of Facts, Ex. 18.) As a result, the contentions of the Third-Party defendants and the affidavit of Mr. Van Norman are woefully inadequate. The evidence establishes that ComEd did not contribute to the pollution at DFP in any manner. Co-defendants will not be allowed to make speculative arguments in the hopes of shifting the blame.

Based on the evidence before the court, ComEd clearly meets the requirements of the Akzo exception. As a result, ComEd has clearly established that the liability for the contamination of DFP is on the shoulders of Third-Party Defendants.

### 2. Statute of Limitations

Third-Party Defendants argue that the statute of limitations bars ComEd's § 107(a) claim. 42 U.S.C. § 9613(g)(2) provides the statute of limitations for § 107(a):

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--
>
> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action: and
>
> (B) For a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). Additionally, CERCLA defines removal to mean as follows:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or a threat of release.

42 U.S.C. § 9601(23). In other words, removal actions are generally short-term actions taken to "cleanup or remov[e] released hazardous substances from the environment" including actions to "monitor, assess, and evaluate." 42 U.S.C. § 9601(23). Remedial actions, on the other hand, are "those actions consistent with permanent remedy taken instead of or in addition to removal action." 42 U.S.C. § 9601(24). All parties agree that this case involves a removal action. So the question is when the statute of limitations to recover costs of removal began to run.

ComEd argues that it is within the statute of limitations for removal actions. ComEd contends that all its actions from 1972 until 2000 are part of one continuous removal action. Third-Party Defendants argue that ComEd began its removal action in 1974 and completed it in 1976. As support, Third-Party Defendants cite the 1981 IEPA formal recognition of ComEd's satisfactory

18

cleanup of the Bryon Station property. (See Consolidated Local Rule 56.1 Statement of Facts, Ex.

19.) Third-Party Defendants contend that ComEd was not required by any federal or state agency

to continue any monitoring or cleanup after 1981. Further, Third-Party defendants offer that an

interpretation allowing ComEd to pursue this action would gut the statue of limitations. Again, the

court finds the arguments of ComEd persuasive.

     The Seventh Circuit has not directly addressed the issue of the initiation of the statute of

limitations for removal activities, but other circuits and courts offer guidance. CERCLA defines the

single 'removal date' as the date of the last activity described in § 9601(23), such as monitoring,

assessing, or evaluating a release of hazardous material." Nutrasweet Company v. X-L Engineering,

926 F. Supp. 767, 770 (N.D. Ill. 1996) (J. Norgle).  The Sixth Circuit in Kelley v. E.I. DuPont De

Nemours and Co., 17 F.3d 836 (6th Cir. 1994), has provided a structure to assess whether a removal

action is complete.  The structure is premised on the belief that Congress intended that the term

"removal action" be given a broad interpretation:

> First, the statutory definition of "removal" is broad, and encompasses
> both physical removal and all RI/FS "monitor[ing], assess[ing], and
> evaluat[ing]" activities.   The Statute does not give a separate
> definition for "removal action." However, it is more reasonable to
> conclude that Congress perceived no need to define it, having defined
> removal, than it is to assume that Congress intended removal action
> to have some unique, but undefined, meaning.

Kelley, 17 F.3d at 843 (internal citations omitted). Courts within the Northern District of Illinois

have concluded in the same manner of the Sixth Circuit that "the remedial intent of CERCLA

requires a liberal statutory construction in order to avoid frustrating its purpose.  Accordingly, § 9613

must be afforded a broad and liberal construction so as to avoid limiting the liability of those

responsible for cleanup costs beyond the limits expressly provided." United States v. Petersen Sand

and Gravel, Inc., 824 F.Supp. 751, 755 (N.D. Ill. 1991). Thus, "it is simply inconsistent with these 'essential purpose,' to require suit on each arguably independent removal activity. Such a result could only be 'demonstrably at odds with the intentions of [the statute's] drafters.'" Kelley, 17 F.3d at 843 (internal citations omitted). "Congress's [sic] choice of the modifying articles "a" and "the" to precede "removal action," if it proves anything, proves Congress intended that there generally will be only one removal action." Id. "Yet, 'removal' as defined in CERCLA involves much more than the plain meaning of the term, it encompasses "the cleanup or removal of released hazardous substances, . . . such action as may be necessary to monitor, assess, and evaluate the release, . . . the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health or welfare or to the environment . . ." Nutrasweet, 926 F. Supp. at 770.

The evidence establishes that ComEd is within the statute of limitations based on its continued removal activities. From 1974 through 1976, ComEd conducted soil and groundwater sampling and analysis, removal of drums and barrels, and soil treatment. After 1976, ComEd embarked on extensive groundwater analysis that continued until 1991. However, in 1987 the USEPA had placed DFP on the National Priority List. In 1994 the USEPA issued a RI/FS which confirmed that DFP was still contaminated. Further, the USEPA issued two RODs in 1998 and 1999. The September 1998 ROD addressed, through excavation and treatment, soil source materials constituting a principal threat at the site. (See ComEd's Reply to Respondents' Additional Statement of Facts, Ex. 1, p. 6.) The December 1999 ROD addressed, through monitoring, groundwater contamination. (See id.) Both of these ROD's are parts of an overall evaluation of Byron Superfund Site which establishes a remedial plan following removal activities. What proceeded the RODs

clearly falls under § 9601(23) definition of removal. See United States v. Petersen Sand and Gravel, Inc., 824 F.Supp. at 755. Thus, the statute of limitation would begin to run from December of 1999. ComEd filed its third-party complaint on March 23, 1992, prior to even the start of the limitations period. ComEd's Suit is not time barred

### 3. Innocent Purchaser

Third-Party Defendants also argue that ComEd was not an innocent purchaser of DFP and is not entitled to financial recovery under § 107(a). Specifically, Third-Party Defendants contend that ComEd purchased DFP knowing it was polluted. Third-Party Defendants cite to 42 U.S.C. § 9601(35)(B), which states several factors to determine whether a purchaser is innocent:

> [T]he defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

42 U.S.C. § 9601(35)(B). Third-Party Defendants contend that when these factors are applied to the evidence, ComEd is not an innocent purchaser. Thus, Third-Party Defendants argue that since ComEd is not an innocent purchaser, it is not an innocent landowner as necessary under § 107(a) and the Akzo exception.

Unfortunately, this argument is a non sequitur. The innocent purchaser exception under 42 U.S.C. § 9607(b)(3) is a defense to liability. "There shall be no liability under subsection(a) of this section for a person otherwise liable who can establish" he is an innocent purchaser. 42 U.S.C. §

21

9607(b).  ComEd's status as an innocent purchaser is irrelevant to its action to recover under §

107(a) from the Third-Party Defendants.  The current motion involves ComEd as a Third-Party

Plaintiff, not as a defendant.  ComEd is a landowner forced to cleanup hazardous materials that a

third-party dumped onto its property or caused to migrate there from adjacent land.  See Nutrasweet,

227 F.3d at 764.  For this reason, Third-Party Defendants' argument fails.

## C. Miscellaneous Arguments

Rockford Products argues that ComEd's motion for partial summary judgment should be

dismissed for failure to comply with the Federal Rules of Civil Procedure and Evidence.  The court

finds Rockford Products arguments without merit.  All parties have complied with Federal Rule of

Civil Procedure 56, as well as Local Rule 56.1 in their evidentiary submissions.  Rockford Products'

argument is unsupported by any citation to case law.  See Doherty v. City of Chicago, 75 F.3d 318,

324 (7th Cir. 1996) (not the role of court to research and construct the legal arguments open to

parties).  Thus, the court finds no further need to address this argument.

### III. CONCLUSION

For the foregoing reasons, Defendant/Third-Party Plaintiff ComEd's motion for partial summary judgment is granted. Third-Party Defendants Amerock, GM, Keystone, Qaulity Metal, and Valspars' cross-motion for summary judgment against ComEd is denied. Additionally, Third-Party Defendant Rockford Products' cross-motion for summary judgment against ComEd is denied.

IT IS SO ORDERED

ENTER:

_____

CHARLES RONALD NORGLE, SR. Judge

United States District Court

DATED: 4-8-02